UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYMOND L. S.,[1]<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>KILOLO KIJAKAZI, Acting Commissioner of Social Security,<br><br>　　　　　　Defendant. | Case No. 5:20-cv-02019-JC<br><br>MEMORANDUM OPINION AND ORDER OF REMAND |

**I.　SUMMARY**

On September 29, 2020, plaintiff filed a Complaint seeking review of the Commissioner of Social Security's denial of plaintiff's application for benefits. The parties have consented to proceed before the undersigned United States Magistrate Judge.

This matter is before the Court on the parties' cross motions for summary judgment, respectively ("Plaintiff's Motion") and ("Defendant's Motion") (collectively "Motions"). The Court has taken the Motions under submission

---

[1] Plaintiff's name is partially redacted to protect his privacy in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

without oral argument.  See Fed. R. Civ. P. 78; L.R. 7-15; Case Management Order filed on May 10, 2021, at ¶ 5.

Based on the record as a whole and the applicable law, the decision of the Commissioner is REVERSED AND REMANDED for further proceedings consistent with this Memorandum Opinion and Order of Remand.  Substantial evidence does not support the Administrative Law Judge's ("ALJ's") residual functional capacity assessment.

## II.   BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION

On December 20, 2018, plaintiff filed applications for Supplemental Security Income and Disability Insurance Benefits, alleging disability beginning on December 8, 2018, due to seizures and moderate degenerative joint disease of the lumbar spine.  (Administrative Record ("AR") 262-74, 292).  The ALJ subsequently examined the medical record and heard testimony from plaintiff (who was represented by counsel) and a vocational expert, where plaintiff asserted he also suffered from major depressive disorder and post traumatic stress disorder ("PTSD").  (AR 41-65).

On June 25, 2020, the ALJ determined that plaintiff had not been disabled through the date of the decision. (AR 16-35). Specifically, the ALJ found: (1) plaintiff suffered from the following severe impairments:  seizure disorder, PTSD, major depressive disorder, anxiety, degenerative disc disease, and substance abuse (AR 18-19); (2) plaintiff's impairments, considered individually or in combination, did not meet or medically equal a listed impairment (AR 19-21); (3) plaintiff retained the residual functional capacity to perform medium work (20 C.F.R. §§ 404.1567(c), 416.967(c)), with additional limitations[2] (AR 21-32);

---

[2]The ALJ determined that plaintiff would be limited to:  (1) occasionally climbing stairs and ramps, never climbing ladders and scaffolding; (2) occasionally balancing, stooping,
(continued...)

(4) plaintiff was unable to perform his past relevant work (AR 33); (5) plaintiff could perform other work existing in significant numbers in the national economy and therefore was not disabled (AR 33-34 (adopting vocational expert testimony at AR 62-64)); and (5) plaintiff's statements regarding the intensity, persistence, and limiting effects of subjective symptoms were not entirely consistent with the medical evidence and other evidence in the record (AR 22-29).  On August 18, 2020, the Appeals Council denied plaintiff's application for review.  (AR 1-3).

### III.   APPLICABLE LEGAL STANDARDS

#### A.   Administrative Evaluation of Disability Claims

To qualify for disability benefits, a claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012) (quoting 42 U.S.C. § 423(d)(1)(A)) (internal quotation marks omitted), superseded by regulation on other grounds as stated in Sisk v. Saul, 820 Fed. App'x 604, 606 (9th Cir. 2020); 20 C.F.R. §§ 404.1505(a), 416.905(a).  To be considered disabled, a claimant must have an impairment of such severity that he is incapable of performing work the claimant previously performed ("past relevant work") as well as any other "work which exists in the national economy."  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)).

///

---

²(...continued)
kneeling, crouching, and crawling; (3) no work at unprotected heights or around dangerous moving machinery; (4) no commercial driving or operating heavy equipment; (5) understanding, remembering, and applying simple and detailed instructions, and concentrating and persisting for extended periods to complete simple and detailed work tasks with routine supervision; (6) occasionally interacting with the general public; and (7) adapting to work in a routine work setting where changes are infrequent, well explained and introduced gradually.  (AR 21).

To assess whether a claimant is disabled, an ALJ is required to use the five-step sequential evaluation process set forth in Social Security regulations.  See Stout v. Commissioner, Social Security Administration, 454 F.3d 1050, 1052 (9th Cir. 2006) (describing five-step sequential evaluation process) (citing 20 C.F.R. §§ 404.1520, 416.920).  The claimant has the burden of proof at steps one through four – *i.e.*, determination of whether the claimant was engaging in substantial gainful activity (step 1), has a sufficiently severe impairment (step 2), has an impairment or combination of impairments that meets or medically equals one of the conditions listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings") (step 3), and retains the residual functional capacity to perform past relevant work (step 4).  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (citation omitted).  The Commissioner has the burden of proof at step five – *i.e.*, establishing that the claimant could perform other work in the national economy.  Id.

### B.  Federal Court Review of Social Security Disability Decisions

A federal court may set aside a denial of benefits only when the Commissioner's "final decision" was "based on legal error or not supported by substantial evidence in the record."  42 U.S.C. § 405(g); Trevizo v. Berryhill, 871 F.3d 664, 674 (9th Cir. 2017) (citation and quotation marks omitted).  The standard of review in disability cases is "highly deferential."  Rounds v. Commissioner of Social Security Administration, 807 F.3d 996, 1002 (9th Cir. 2015) (citation and quotation marks omitted).  Thus, an ALJ's decision must be upheld if the evidence could reasonably support either affirming or reversing the decision.  Trevizo, 871 F.3d at 674-75 (citations omitted).  Even when an ALJ's decision contains error, it must be affirmed if the error was harmless.  See Treichler v. Commissioner of Social Security Administration, 775 F.3d 1090, 1099 (9th Cir. 2014) (ALJ error harmless if (1) inconsequential to the ultimate nondisability determination; or (2) ALJ's path may reasonably be discerned despite the error) (citation and quotation marks omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Trevizo, 871 F.3d at 674 (defining "substantial evidence" as "more than a mere scintilla, but less than a preponderance") (citation and quotation marks omitted). When determining whether substantial evidence supports an ALJ's finding, a court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion[.]" Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014) (citation and quotation marks omitted).

Federal courts review only the reasoning the ALJ provided, and may not affirm the ALJ's decision "on a ground upon which [the ALJ] did not rely." Trevizo, 871 F.3d at 675 (citations omitted). Hence, while an ALJ's decision need not be drafted with "ideal clarity," it must, at a minimum, set forth the ALJ's reasoning "in a way that allows for meaningful review." Brown-Hunter v. Colvin, 806 F.3d 487, 492 (9th Cir. 2015) (citing Treichler, 775 F.3d at 1099).

A reviewing court may not conclude that an error was harmless based on independent findings gleaned from the administrative record. Brown-Hunter, 806 F.3d at 492 (citations omitted). When a reviewing court cannot confidently conclude that an error was harmless, a remand for additional investigation or explanation is generally appropriate. See Marsh v. Colvin, 792 F.3d 1170, 1173 (9th Cir. 2015) (citations omitted).

**IV. DISCUSSION**

Plaintiff raises issues with the ALJ's consideration of his testimony and statements and of the medical opinions of record concerning plaintiff's mental limitations. (Plaintiff's Motion at 4-6). For the reasons stated below, the Court finds that substantial evidence does not support the ALJ's residual functional capacity assessment. Since the Court cannot find that the error was harmless, a remand is warranted.

///

**A.     Summary of the Relevant Medical Record**[3]

   **1.     Medical Records**

As detailed below, the record reflects ongoing treatment for seizures and mental health issues, a long history of alcohol and marijuana use, and program assistance with transitional housing and living skills for plaintiff who was homeless as of the alleged onset date.

At an emergency room visit and subsequent follow up for seizure in December 2018, plaintiff notedly had a history of alcohol use with recent "discontinuation" the prior week, a history of two prior alcohol withdrawal seizures, and he reportedly had taken Lorazepam for anxiety dating back to July of 2018. (AR 342, 345, 404-06; see also AR 347-48 (August 2018 note reporting long history of alcohol withdrawal seizures in the past, and noting that plaintiff was cooperative with appropriate mood and affect, normal judgment and non-suicidal); AR 353-54 (July 2018 note for alcohol withdrawal seizure noting plaintiff needed to curtail his alcohol use/abuse)). A brain MRI showed no evidence of acute infarct, mass or hemorrhage, and only a 3-mm right hippocampal sulcal remnant cyst, and an EEG also was normal. (AR 361-63, 382-84; see also AR 405 (note that July, 2018 head CT scan that was unremarkable); AR 430 (March, 2019 PET/CT brain scan that was normal)). Plaintiff was approved to take Keppra for his seizures. (AR 373-74, 407).

Plaintiff presented to the West Los Angeles Veterans Affairs ("VA") Medical Center in December 2018, for homeless program services. (AR 386). He reportedly had been homeless on and off for several years with his last stable housing seven years earlier. (AR 387). His homelessness reportedly appeared to be due to substance abuse and mental illness, and he admitted drinking alcohol and

---

[3]Since the issues raised herein concern only plaintiff's mental impairments, limitations and abilities, the Court has not summarized the evidence concerning plaintiff's physical impairments.

6

using cannabis when he could afford it. (AR 387-88). He had a history of alcohol or drug abuse/dependence and depression. (AR 389). His short term goal was to go to a residential treatment program for alcohol and cannabis use, address his seizure disorder, and eventually go back to work. (AR 391). On examination, he had a euthymic mood, linear thought process, intact insight/judgment and fair impulse control, and otherwise findings within normal limits. (AR 391). Plaintiff was referred to a "domiciliary" program. (AR 391).

Plaintiff returned for a psychology consultation with Dr. Nanci Argueta in February 2019, complaining of a history of seizures for the past year, alcohol use, difficulty adjusting to being unable to work or drive due to seizures, social anxiety, and a history of suicidal ideations. (AR 377). He then was living with his uncle. (AR 377). Plaintiff previously had been in a mental health program at the Loma Linda VA. (AR 387). Plaintiff was polite, cooperative with a slightly anxious mood initially, congruent affect, and normal speech. (AR 378). Dr. Argueta approved plaintiff for outpatient care. (AR 378).

Plaintiff underwent a neuropsychology consultation with Drs. Garima J. Lupas and Charles H. Hinkin in April 2019, complaining of, *inter alia*, mild memory lapses, longstanding social anxiety, sadness and frustration that his driver's license was suspended due to his seizures which precluded him from working. (AR 512-23). Plaintiff had been diagnosed with an unspecified anxiety disorder for which he attended therapy from 2016 through July 2018, and admitted a history of suicidal ideation/attempts, and a history of excessive alcohol use, drinking 10-12 beers a day until December 2018. (AR 514-15). Plaintiff described his mood as anxious and his affect was full range and congruent with session content, he had slightly pressured speech and a somewhat tangential thought process, but he also appeared generally alert and attentive, was cooperative, exhibited good persistence and frustration tolerance, and worked diligently putting forth good effort. (AR 515-16). On testing, his IQ was average, measures of

simple attention and working memory were within normal limits, his sustained attention/vigilance was variable suggesting some difficulty sustaining attention over an extended period of time, his language was average/high average, his visuospatial skills were within normal limits, and his learning and memory were intact, with significant benefit from repeated exposure to the multi-trial list learning task, and overall excellent learning. (AR 516). There was evidence of proactive interference, indicating that old information significantly interfered with learning new verbal information. (AR 516). He was able to recall almost all words from an initial list following a 20-minute delay. (AR 516). Other memory measures and executive functioning were intact, and he had low average processing speed. (AR 516-17). Plaintiff reportedly performed well on cognitive testing and had no areas of frank impairment in any cognitive domain – he only had "subtle weakness" in sustained attention, some aspects of executive functioning, and motor speed/dexterity. (AR 518).

The psychologists concluded that plaintiff likely meets criteria for social anxiety disorder, and he had possible agoraphobic tendencies and possible undiagnosed attention deficit/hyperactivity disorder. (AR 518-19). They recommended individual psychotherapy, a psychiatry referral, occupational counseling/rehabilitation, and taking frequent breaks while working on tasks for extended periods of time, reducing distractions and working in a quiet, uncluttered, uninterrupted area, and noted that plaintiff may have trouble and become frustrated in situations requiring flexibility and adaptation. (AR 519).

Plaintiff returned for an initial mental health assessment with Dr. Argueta in May 2019, complaining of anxiety and depression with anhedonia, decreased appetite, insomnia, fatigue, excessive guilt and worthlessness, and suicidal ideation when he has been under the influence. (AR 412-18). Plaintiff had experienced multiple traumatic events during his military service, followed by nightmares, hallucinations, negative affective changes, negative cognitive changes, avoidance,

8

hypervigilance, and muscle tension. (AR 412). Plaintiff admitted a history of alcohol use and THC use since ages 21 and 24, respectively. (AR 415). He reported no prior psychiatric treatment, but had some individual therapy for less than a year which he found helpful. (AR 412). Plaintiff's treatment plan was for individual therapy for six to 12 months, social work assistance with housing and financial resources, and he declined to attend group therapy. (AR 414).[4] Plaintiff also declined pharmacotherapy in favor of behavioral treatment, reporting elsewhere that he wanted to feel like himself and "not be out of it." (AR 414, 754).

Plaintiff was admitted to the hospital for four days in August 2019, for possible epilepsy and monitoring, but his stay was "non-diagnostic" – there was no EEG evidence of seizures, so doctors thought plaintiff's seizures were likely "PNES" (psychogenic nonepileptic seizures). (AR 452-62). Mental status examination at the time was within normal limits, as was neuropsychological testing except for anxiety and depression inventories which suggested moderate anxiety and mild depression. (AR 456, 458-62). Plaintiff's Keppra was continued. (AR 462).[5]

In September 2019, plaintiff presented for an initial homeless assessment with a social worker to determine whether he met criteria for housing assistance. (AR 812). He had been living in his car in a "safe parking program" and notedly appeared to minimize his use of substances and mental health treatment. (AR 812). There were several discrepancies between plaintiff's report and chart (*e.g.*, plaintiff

---

[4]Plaintiff did attend group skills training, and related notes from November 2019 reported that plaintiff smiled and laughed and was getting comfortable in the group sharing each week, however he did not feel comfortable role playing. (AR 706, 725, 727-30).

[5]Plaintiff thereafter reportedly was experiencing about one seizure per month. See AR 584-92 (February 2020 emergency room visit noting that plaintiff was suffering about one seizure a month); see also AR 628-34, 659-66 (December 2019 seizure treatment notes); AR 711-23, 739-48 (November 2019 seizure treatment notes); AR 778-90 (October 2019 seizure treatment notes); AR 818-21 (September 2019 seizure treatment notes).

9

reported being homeless since 2016, but his chart said he was homeless since July 2019). (AR 812-13). On examination, he was alert and oriented, unkempt, lacked personal grooming, compliant, made eye contact, spoke clearly, was able to express himself, had intact memory, appropriate thought content, good judgment, calm mood, and appropriate affect. (AR 816). He was put on a list for housing assistance. (AR 817).

Later in September 2019, plaintiff notedly was discharged from the safe parking program because of an incident between plaintiff and VA social workers and security. (AR 793). Plaintiff reportedly had become agitated when a security guard inquired about his name and safe parking tag, leading to a search of plaintiff's car and plaintiff claiming that he had been singled out and that his rights had been violated. (AR 794). Plaintiff reportdly expressed paranoid thoughts regarding signing a release of information, and allegedly was increasingly agitated and posturing, yelling at social workers and other participants. (AR 794-95). Plaintiff reportedly was angry with pressured speech and loud tone, was in acute psychological distress, was easily agitated, avoided eye contact, and had poor insight. (AR 795).

Plaintiff followed up with Dr. Argueta later in September to make a complaint, and Dr. Argueta noted that plaintiff had been in treatment for PTSD but unable to start "EBP" due to his current housing situation and need for greater stabilization. (AR 795-96). Plaintiff was friendly and cooperative with Dr. Argueta though expressing frustration. (AR 796). In another note, it is reported that plaintiff had an appointment to see a psychiatrist in October, but he stated his desire to take no psychiatric medications. (AR 754).

Plaintiff began residing at the New Directions Program (VA transitional housing) in October 2019. (AR 769). Over several visits, plaintiff reported to Dr. Argueta having difficulty adjusting to sharing a room with other people. (AR 737, 748, 756-57).

By March 2020, plaintiff reported being tired of living at the VA and wanting to move, that he was not being treated well, and that he had multiple hostile interactions with VA police who had beat him up leading to a "case." (AR 550-52, 555-58; see also AR 574, 579-80 (plaintiff detailing incident(s) with VA security/police)). When plaintiff spoke with a housing specialist, he reportedly was tense, cursing, and stating that he no longer wanted to live in VA housing. (AR 555-56). On examination, he was agitated and had bouts of shouting and cursing, but had fair judgment. (AR 556). Even so, at these and earlier visits, plaintiff reportedly was alert, neat, appropriate, candid, cooperative/polite, able to express himself, and had appropriate thought content and perceptions and good judgment, but had an angry/anxious/euthymic mood. (AR 547, 552, 556; see also, e.g., AR 561 (February 2020 note reporting same findings but for frustrated mood); AR 563 (February 2020 note reporting plaintiff was polite and cooperative with a slightly anxious mood); AR 564 (February 2020 note reporting plaintiff was cooperative and participatory, made consistent eye contact, had euthymic/angry mood, labile affect, sometimes high volume speech, some thought perserveration, and fair judgment/insight); AR 566 (February 2020 note reporting plaintiff was agitated, candid/cooperative, open, able to express himself, had angry/hurt mood, tense/tearful affect, and fair judgment); AR 567 (February 2020 note reporting plaintiff was very polite and cooperative, and his mood was initially slightly anxious with congruent affect); AR 574-75 (February 2020 note reporting plaintiff was cooperative, calm with euthymic mood, congruent affect, normal speech, normal thought, and good concentration, cognition, memory, judgment, and insight); AR 580 (February 2020 note reporting plaintiff was candid/cooperative,

///
///
///
///

open, able to express himself, with appropriate thoughts, good judgment, calm/ euthymic mood, and appropriate affect)).[6]

### 2. Opinion Evidence

State agency physicians reviewed the record initially in February 2019, and found medically determinable impairments of epilepsy and substance abuse disorders (alcohol) were non-severe and severe, respectively, and found insufficient evidence to evaluate plaintiff's claim. See AR 72-73, 81-82 (explaining, "[Claimant] alleges anxiety; there is no medical evidence to establish MDI [medically determinable impairment]. NH has a history of alcohol abuse and alcohol withdrawal seizures. Rx. Ativan for anxiety.").

On reconsideration in May 2019, state agency physicians found plaintiff's medically determinable impairment of epilepsy was severe, and other medically determinable impairments (substance abuse disorders (alcohol), and anxiety and obsessive-compulsive disorders) were non-severe. (AR 90, 100). They opined that plaintiff should have seizure precautions (*i.e.*, never climbing ramps stairs, ladders, ropes or scaffolds, and avoiding all exposure to hazards and heavy machinery), but found no exertional limits. (AR 91-93, 101-03). These reviewers did not consider any VA records after February of 2019. (AR 87-89, 97-99).

Dr. Arguota completed a Mental Residual Functional Capacity Questionnaire dated April 1, 2020, reporting she had treated plaintiff every one-to-two weeks since February 2019, for PTSD, major depressive disorder, and epilepsy, and with a fair to poor prognosis. (AR 1045-49). Dr. Arguota opined that plaintiff would have:

///

---

[6]Earlier mental health treatment notes report similar findings on examination. See AR 606, 612-13, 620, 624, 626, 627, 643, 649, 651, 673, 674, 676, 683-84, 686, 690-91, 692, 695, 697, 703, 708, 724, 731, 737, 749, 752, 754-55, 757, 773, 776-77, 804, 806, 808, 809, 812, 817, 932, 941, 943, 944, 945-46, 948, 952, 956, 962-63, 966, 968, 970, 972-73, 978-79 (notes from June 2019 through January 2020).

(1) no understanding or memory impairments (*i.e.*, he could remember locations and work-like procedures, understand and remember very short and simple instructions and detailed instructions, and carry out very short and simple instructions);

(2) "category II" impairment (*i.e.*, precluding performance for five percent of an eight-hour workday, not including normal breaks, or limitations due to substance or alcohol abuse) in carrying out detailed instructions, performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerances, being aware of work hazards and taking appropriate precautions, and setting realistic goals and plans independently of others;

(3) "category III" impairment (*i.e.*, precluding performance of 10 percent of a workday, not including normal breaks, or limitations due to substance or alcohol abuse) sustaining an ordinary routine without special supervision, making simple work-related decisions, asking simple questions or requesting assistance, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintaining socially appropriate behavior, and responding appropriately to changes in the work setting; and

(4) "category IV" impairment (*i.e.*, precluding performance of 15 percent or more of a workday, not including normal breaks, or limitations due to substance or alcohol abuse) in maintaining attention and concentration for extended periods of time, working in coordination and in proximity to others without being distracted by them, and completing a normal workday or workweek without interruptions from psychologically based symptoms and performing at a consistent pace without unreasonable rest periods, interacting appropriately with the general public, accepting instructions and responding

     appropriately to criticism from supervisors, and traveling in

     unfamiliar places or using public transportation. (AR 1046-47).

  Dr. Arguota also opined that plaintiff would be off task for more than 30 percent of a workday,[7] would miss five or more days of work per month, would be unable to complete an eight-hour workday five or more days per month, would be efficient for less than 50 percent of a workday, and that plaintiff would be unable to work in a competitive work setting for eight hours a day, five days a week, for at least six months. (AR 1048). Dr. Arguota explained:

     Mr. [S] has been under my care for mental health conditions since

     February 7, 2019. Due to his seizure disorder, he was unable to work

     which led to an exacerbation of [symptoms] of PTSD and MDD

     [major depressive disorder] that had gone undiagnosed for likely

     decades. The exacerbation in PTSD and MDD symptoms have [sic]

     significantly negatively impacted his social and occupational

     functioning. At this stage in his progress, he would be impeded by his

     medical and mental health symptoms if he were to pursue

     employment.

(AR 1049).

### B. Pertinent Law

  For claims filed after March 27, 2017 (such as plaintiff's present claims), new regulations govern the evaluation of medical opinion evidence. Under these regulations, ALJs no longer "weigh" medical opinions; rather, ALJs determine which opinions are the most "persuasive" by focusing on several factors: (1) supportability; (2) consistency; (3) relationship with the claimant (including the length of treatment, frequency of examinations, purpose of treatment, extent of treatment, whether the medical source examined the claimant); (4) the medical

---

  [7]The vocational expert testified that if a person with the limitations the ALJ found to exist were also off task 20 percent of a typical workday, it would preclude all work. (AR 63-64).

source's specialty; and (5) "other" factors. See 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). The two most important factors in determining the persuasiveness of medical opinions are supportability and consistency with the evidence. See 20 C.F.R. §§ 404.1520c(a), 416.920c(a). ALJs must explain how they considered the factors of supportability and consistency, but need not explain how they considered any other factor. See 20 C.F.R. §§ 404.1520c(b), 416.920c(b).

> Supportability means the extent to which a medical source supports the medical opinion by explaining the "relevant. . . objective medical evidence." Consistency means the extent to which a medical opinion is "consistent. . . with the evidence from other medical sources and nonmedical sources in the claim.

Woods v. Kijakazi, 32 F.4th 785, 791-92 (9th Cir. 2022) (internal citations omitted; citing 20 C.F.R. § 404.1520c(c)(1), (2)).

The new regulations also eliminated the term "treating source," as well as the rule previously known as the treating source rule or treating physician rule, which formerly required special deference to the opinions of treating sources. See 20 C.F.R. §§ 404.1520c, 416.920c; Woods v. Kijakazi, 32 F.4th at 792 ("The revised social security regulations are clearly irreconcilable with our caselaw according special deference to the opinions of treating and examining physicians on account of their relationship with the claimant."). Even so, in evaluating medical opinion evidence "under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence." Woods v. Kijakazi, 32 F.4th at 792. Finally, the new regulations command that an opinion that a claimant is disabled or not able to work is "inherently neither valuable nor persuasive," and an ALJ need not provide any analysis about how such evidence is considered. See 20 C.F.R. §§ 404.1520b(c)(3), 416.920b(c)(3).

As explained below, while the ALJ appears to have followed these new regulations in making the relevant findings based on the available record, substantial evidence does not support the ALJ's resultant residual functional capacity determination.

### C. Analysis

In determining plaintiff's residual functional capacity, the ALJ found "unpersuasive" the state agency physician's opinions, which had found insufficient evidence to evaluate plaintiff's claims initially, and plaintiff's mental conditions non-severe on reconsideration. (AR 29-31). The ALJ reasoned that the consultants did not have an opportunity to review all the evidence of record, which reflected that plaintiff had difficulty interacting with others at the VA, and plaintiff's struggles with homelessness and adapting in certain situations. See AR 31 (ALJ observing, however, that plaintiff was normally able to deescalate situations with minimal therapy, and had fair to good insight and judgment even when experiencing exacerbated symptoms). The ALJ concluded, "I find the residual functional capacity herein adequately addresses his impairments." (AR 31).[8]

The ALJ found "partially persuasive" Dr. Argueta's opinion, which had found that plaintiff would have significant limitations of disabling severity based on treatment post-dating the record the state agency physicians reviewed, given

---

[8] To the extent plaintiff's neuropsychology consultation with Drs. Lupas and Hinkin, which resulted in recommendations that plaintiff take breaks while working on tasks for extended periods of time, reduce distractions and work in a quiet, uncluttered, uninterrupted area, with a note that plaintiff may have trouble and become frustrated in situations requiring flexibility and adaptation (see AR 519), could be construed as a medical opinion, the ALJ found their opinion "partially persuasive" as inconsistent with plaintiff's reported ability during occupational therapy building a model airplane to work without frequent breaks, and plaintiff's reported normal attention and concentration on mental status examinations. (AR 32). The ALJ found, consistent with their opinion, that plaintiff would have difficulties in adaptation, but given plaintiff's normal mental status exams and improvement with therapy, the ALJ concluded that the residual functional capacity the ALJ adopted adequately addressed plaintiff's mental impairments. (AR 32).

that plaintiff experienced "exacerbation in mental health difficulties" primarily associated with his diagnosed seizure disorder (which led to his inability to drive and work and to his homelessness). (AR 31-32). However, the ALJ found Dr. Argueta's opinion was not entirely supported by the longitudinal record or Dr. Argueta's treatment of plaintiff. The ALJ cited: (1) Dr. Argueta's conservative treatment of plaintiff without any regular ongoing medication management or inpatient hospitalization as inconsistent with the significant limitations Dr. Argueta assessed;[9] (2) Dr. Argueta's opinion purportedly lacking any consideration for plaintiff's substance abuse troubles;[10] (3) plaintiff's "primarily normal" mental status findings, reported improvement with therapy, often normal insight and judgment, and ability to talk his way through angry or irritable moods; and (4) plaintiff's neurological and psychological examinations that did not reveal any significant cognitive deficits, and the fact he was able to work through occupational therapy building an airplane, despite plaintiff's complaints of difficulties with memory and attention/concentration. (AR 32).

The ALJ did not explain which, if any, of Dr. Argueta's specific limitations for plaintiff the ALJ may have found persuasive. Rather, the ALJ simply concluded:

> . . . I found the evidence supported limitations in interacting with the general public in recognition of those periods of exacerbation.
>
> Further, given the claimant has struggled to adapt to his diagnoses,

---

[9]The ALJ incorrectly described Dr. Argueta as a psychiatrist (rather than a psychologist) (see AR 31, 1049). A psychiatrist has the authority to prescribe medications, whereas a psychologist does not. See, e.g., Sandra H. v. Saul, 2021 WL 529787, at *6 (D. Or. Feb. 11, 2021) (noting same). Substantial evidence does not support this reason as it applies to Dr. Argueta's treatment, but it may support this reason as it may apply to plaintiff's mental health treatment in general.

[10]While Dr. Argueta did not mention substance or alcohol abuse, the form she completed did indicate that certain of the limitations she provided were to not include those from substance or alcohol abuse. (AR 1046).

17

>causing an increase in symptoms, as well as his reported anxiety with changes, I found it reasonable to limit him to a work setting where changes are infrequent and explained and introduced gradually. . . . I find the rating of severe and some limitations is consistent with his history of treatment, noted exacerbations and some reported symptoms, balanced against other normal findings.

(AR 32).

It appears that the ALJ defined plaintiff's residual functional capacity for work with some mental limits (*i.e.*, understanding, remembering, and applying simple and detailed instructions, and concentrating and persisting for extended periods to complete simple and detailed work tasks with routine supervision; occasionally interacting with the general public (and no noted limitations re interacting with coworkers or supervisors); and work in a routine work setting where changes are infrequent, well explained and introduced gradually) based at least in part on the ALJ's lay interpretation of the medical record "in recognition of periods of exacerbation." Compare AR 21, 32 with AR 1046-48 (Dr. Argueta's arguably inconsistent opinion finding "category IV" impairment (15 percent or more of an 8-hour workday) in working in coordination and in proximity to others without being distracted by them, and completing a normal workday or workweek without interruptions from psychologically based symptoms and performing at a consistent pace without unreasonable rest periods, interacting appropriately with the general public, accepting instructions and responding appropriately to criticism from supervisors). No medical source reviewing the updated medical record, which the ALJ acknowledged evidenced "some difficulty interacting with VA police officers as well as roommates or other veterans in his programs" (AR 31), found plaintiff would be capable of working with coworkers or supervisors without limitation.

///

An ALJ's decision must be supported by substantial evidence. See 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). An ALJ cannot properly rely on the ALJ's own lay knowledge to make medical interpretations of examination results or to determine the severity of medically determinable impairments. See Tackett v. Apfel, 180 F.3d 1094, 1102-03 (9th Cir. 1999); Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998); see also Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings"); Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (an ALJ is forbidden from making his or her own medical assessment beyond that demonstrated by the record); McAnally v. Berryhill, 2020 WL 1443734, at *6 (S.D. Cal. March 25, 2020) ("In making an RFC determination, an ALJ may not act as his own medical expert as he is simply not qualified to interpret raw medical data in functional terms") (citations and quotations omitted).

In the present case, absent expert medical assistance, and in light of the treatment evidence suggesting plaintiff's mental condition worsened as reflected by his interactions with others at the VA, the ALJ could not competently translate the updated medical evidence into a physical residual functional capacity assessment. See Tackett v. Apfel, 180 F.3d at 1102-03 (ALJ's residual functional capacity assessment cannot stand in the absence of evidentiary support); see generally Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001) (ALJ's duty to develop the record further is triggered "when there is ambiguous evidence or when the record is inadequate to allow for the proper evaluation of the evidence") (citation omitted); Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983) ("[T]he ALJ has a special duty to fully and fairly develop the record to assure the claimant's interests are considered. This duty exists even when the claimant is

represented by counsel."). It thus appears that substantial evidence does not support the ALJ's conclusion that the limitations the ALJ found to exist adequately account for Plaintiff's severe mental impairments. The state agency physician opinions finding no mental limitations do not serve as substantial evidence. Compare Sonja S. R. v. Berryhill, 2018 WL 3460165, at *6-7 (C.D. Cal. July 16, 2018) (substantial evidence failed to support residual functional capacity determination where state agency physicians' opinions did not consider later medical evidence supporting additional impairments and reflecting "potentially long-term conditions," and the ALJ had rendered ALJ's own lay interpretation of the updated medical record).

## V.  CONCLUSION

For the foregoing reasons, the decision of the Commissioner of Social Security is REVERSED in part, and this matter is REMANDED for further administrative action consistent with this Opinion.[11]

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: August 12, 2022

                                                  /s/
                              Honorable Jacqueline Chooljian
                              UNITED STATES MAGISTRATE JUDGE

---

[11] The Court need not, and has not adjudicated plaintiff's other challenges to the ALJ's decision, except insofar as to determine that a reversal and remand for immediate payment of benefits would not be appropriate. When a court reverses an administrative determination, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Immigration & Naturalization Service v. Ventura, 537 U.S. 12, 16 (2002) (citations and quotations omitted); Treichler, 775 F.3d at 1099 (noting such "ordinary remand rule" applies in Social Security cases) (citations omitted).